John **WALSH**, Josephine Walsh, **Construction Services of Bristol, Inc.,** plaintiffs,

v.

**SEABOARD SURETY COMPANY,** defendant.

No. 3:96CV1138(WWE).

United States District Court, D. Connecticut.

Feb. 7, 2000.

Andrew B. Bowman, Law Offices Of Andrew Bowman, Westport, CT, for plaintiffs.

Steven B. Kaplan, John P. Kane, Joseph B. Mathieu, Michelson, Kane, Royster & Barger, P.C., Hartford, CT, Michael C. Ryan, Hartford, CT, for defendant.

Jane I. Milas, Garcia & Milas, New Haven, CT, for Raymond A. Garcia, movant.

### RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

EGINTON, Senior District Judge.

This case concerns a construction project involving the rehabilitation of an old mill facility located in Middletown, Connecticut, known as the Forge. Plaintiffs allege bad faith, intentional infliction of emotional distress, and violation of the Connecticut Unfair Trade Practices Act. Plaintiffs also claim that the defendant's conduct renders a General Agreement of Indemnity void and unenforceable.

Defendant asserts counterclaims alleging that it is entitled to indemnification pursuant to a written agreement, an implied obligation, and unjust enrichment.

Defendants have moved for summary judgment on all counts of the complaint, and plaintiffs have moved for summary judgment on all counterclaims.

#### Background

The parties have submitted briefs, Local Rule 9(c) statements of facts, and exhibits, which reveal the following undisputed facts.

Plaintiff Construction Services of Bristol, Inc. ("CSB") is a general contractor, and plaintiff John Walsh is the sole shareholder of CSB.

In October 1985, CSB and Forge Square Associates Limited Partnership ("FSALP"), which owned the Forge, executed a project contract for approximately $2.6 million. In March 1986, CSB began work on the Forge project.

In January 1987, CSB and FSALP modified their agreement to reflect a redesign of the project and an increased cost of $4.6 million.

On January 27, 1987, defendant Seaboard Surety Company executed a General Agreement of Indemnity with the plaintiffs. Pursuant to the General Agreement, Seaboard was the surety on the Forge project, CSB was the principal, and Mr. Walsh and his wife Josephine Walsh were the indemnitors.

The General Agreement obligates the plaintiffs to indemnify Seaboard and hold it harmless from and against "liability, losses, costs, damages, attorneys fees, disbursements and expenses of every nature which the Surety may sustain or incur by reason of having executed or procured the execution of any such Bonds."

In paragraph 2, the General Agreement states:

If the Surety shall decline to execute, or procure execution of any Bond for which application hereafter may be made, no claim shall be made against the Surety in consequence of such declination; nor shall any claim be made if any Bond executed be not accepted by or on behalf of the Obligee.

In the event that CSB breached, defaulted or delayed the project, the General Agreement provides that the indemnitors would assign their right and interest in and to:

All deferred payments and retained percentages, and all money and properties that may be, and that thereafter may become payable to the Contractor on account of, and all claims and actions and causes of action relating to, such contract ...

The General Agreement also provides that CSB and the indemnitors appointed:

Seaboard Surety Company his true and lawful attorney for and in his name, place and stead to execute any and all instruments ... to vest in the Surety absolute title to any and all funds, property and/or rights ... assigned, transferred and conveyed ... giving and granting to said attorney full power and authority to do and perform all and every act and thing whatsoever, requisite and necessary to be done in and about the premises ... with full power of substitution and revocation ...

In January 1987, Seaboard issued payment and performance bonds in the amount of 4.6 million.

In spring 1987, Richard Lewis, the Seaboard underwriter handling the CSB account, decided that Seaboard should not write additional bonds for the Forge project. Mr. Walsh admits that Joseph Fratello, who was then a vice president at Seaboard, indicated that Seaboard would wait to see how the Forge project proceeded prior to writing any further bonds.

In June 1988, FSALP notified CSB that it was in default of its contract. On July 8, 1988, CSB was terminated by FSALP.

That day, CSB commenced an arbitration against FSALP before the American Arbitration Association seeking damages for wrongful termination and breach of contract.

Subsequent to CSB's termination, FSALP made demand upon Seaboard to finance the completion of the project per its obligations under the performance bond and filed a demand for arbitration against Seaboard as to its claims on the project. Seaboard tendered the matter to CSB to defend pursuant to its obligations under the General Agreement.

Thereafter, Seaboard received claims from subcontractors of CSB seeking payment under Seaboard's payment bond for labor and materials provided for the Forge project, and it demanded indemnification from the Walshes as indemnitors for these claims.

In 1989, FSALP commenced a "bad faith" lawsuit against Seaboard alleging that Seaboard had failed to adhere to its obligations under the Forge performance bond. FSALP withdrew the action after Seaboard agreed to be bound by the findings of the arbitration panel concerning the contractual disputes between FSALP and CSB.

Later that year, CSB informed Seaboard that it could no longer afford to fund the arbitration proceedings of its own accord and requested Seaboard's financial assistance. Subsequently, Seaboard, CSB and CSB's attorney, Raymond Garcia, reached an agreement whereby Seaboard agreed to pay for the arbitration, and CSB agreed to reimburse Seaboard for its expenses from the proceeds of any award rendered in favor of CSB. CSB also executed an assignment to Seaboard of the arbitration proceeds, which agreement contained provisions releasing Seaboard of all liability existing prior to the date of the agreement and from all claims related to Seaboard's refusal to issue bonds for CSB.

Throughout the arbitration proceedings, Attorney Garcia acted as lead counsel for CSB. Seaboard also retained separate counsel, John Paul Kane, to monitor the arbitration proceedings and protect Seaboard's interests.

In August 1990, the arbitration proceedings commenced. During the hearings, Seaboard requested that Attorney Garcia pursue certain factual or legal issues, which Garcia discussed with CSB in terms of strategy and expense.

In June 1992, the arbitration concluded. CSB was awarded $617,740, plus interest. FSALP was awarded $278,069 on its counterclaim. Therefore, the net award to

CSB was $339,671. Seaboard paid in excess of $900,000 in attorneys fees to Garcia's firm for representation during the arbitration. Subsequently, FSALP appealed the arbitration award to the Superior Court, then the Appellate Court, which both affirmed the arbitration award. A petition for review by the Connecticut Supreme Court was denied in 1994.

CSB sought to enforce the arbitration award by filing a cross claim to foreclose its mechanic's lien in a foreclosure action pending in Connecticut Superior Court. The State of Connecticut, which held the mortgage on the Forge, filed a motion for summary judgment against CSB in that foreclosure action, which motion the trial court granted. CSB appealed the trial court's ruling.

Pending that appeal, the parties attempted to settle the case with the title insurance company representing the State's interests. However, CSB and Seaboard disagreed as to the settlement value of the case, and as to the rights of the parties to control the settlement and retain the proceeds. CSB asserted that it was entitled to a share of the arbitration award.

On December 22, 1994, Seaboard instructed CSB to deposit the arbitration proceeds with Seaboard in the event that it wanted to continue litigating with the title company rather than permit Seaboard to settle the case. CSB failed to deposit the proceeds as instructed but informed Seaboard that it would "reluctantly" authorize a demand to the title company of $950,000 on the condition that $675,000 of the settlement proceeds would go to CSB.

In July 1995, Seaboard settled the case for $350,000. However, the settlement agreement was conditioned upon Seaboard's filing a motion to substitute Seaboard in place of CSB as the real party in interest with regard to the mechanic's lien claim.

Because CSB did not agree that Seaboard was the real party in interest with regard to the mechanic's lien claim, CSB and Seaboard became directly adverse to one another. Attorney Garcia notified Seaboard that he had a conflict of interest in continuing to represent both CSB and Seaboard, and he requested that Seaboard waive the conflict.

Seaboard refused to waive the conflict as to the motion to substitute but did agree to waive all potential conflicts as to the continued prosecution of the mechanic's lien appeal.

On March 12, 1996, the trial court granted Seaboard's motion to substitute. However, the appellate court reversed that decision on procedural grounds because Seaboard had not filed its motion to substitute within four months after the grant of summary judgment as required by Conn.Gen.Stat. Section 52–212a.[1]

CSB then negotiated a settlement of the underlying mechanic's lien with the title company for the amount of $400,000, which sum is presently being held in escrow pending resolution of the present case.

### Discussion

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. *American International Group, Inc. v. London American International Corp.*, 664 F.2d 348, 351 (2d Cir.1981). In determining

---

**1.** Section 52–212a provides that a civil judgment or decree rendered in the superior court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which it was rendered.

whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

## A.  Bad Faith

Plaintiffs assert that Seaboard maintained a continuing course of conduct in order to destroy the plaintiffs, protect itself from FSALP's counterclaim, and to obtain an award against FSALP. Specifically, plaintiffs' claim of bad faith is based on allegations that defendant Seaboard (1) "repeatedly, maliciously, and wantonly refused, without justification, to issue performance and payment bonds" for CSB; (2) deceived the plaintiffs by concealing the decision not to bond CSD's construction project, misrepresenting that it would provide future bonds, and refusing to give plaintiffs a written answer to plaintiffs' requests for bonding; (3) manipulated and controlled Attorney Garcia; (4) compelled CSB to sign an agreement to release Seaboard from its obligations; (5) continued to demand reimbursement from the plaintiffs; (6) caused excessive and unnecessary legal fees; (7) deprived CSB from the right to enforce and collect the arbitration award; and (8) imposed coercive pressure on Attorney Garcia. Defendant argues that plaintiffs have insufficient evidence to support their allegations of bad faith.

■ Every contract imposes upon each party a duty of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. *Gupta v. New Britain General Hospital,* 239 Conn. 574, 598, 687 A.2d 111 (1996). The implied obligation of good faith is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. The principle cannot be applied to achieve a result contrary to the clearly expressed terms of a contract unless those terms are contrary to public policy. *Magnan v. Anaconda Industries, Inc.,* 193 Conn. 558, 567, 479 A.2d 781 (1984).

■ Bad faith implies actual or constructive fraud, a design to mislead or deceive, or a neglect or refusal to fulfill some duty or some contractual obligation prompted by some interested or sinister motive. *Habetz v. Condon,* 224 Conn. 231, 237, 618 A.2d 501 (1992). Bad faith implies the conscious doing of a wrong because of dishonest purpose and a state of mind affirmatively operating with furtive design or ill will. *Buckman v. People Express, Inc.,* 205 Conn. 166, 171, 530 A.2d 596 (1987).

*L.F. Pace & Sons, Inc. v. The Travelers Indemnity Company,* 9 Conn.App. 30, 514 A.2d 766 (1986) recognized that a claim for bad faith may ensue where a surety refuses to issue performance and payment bonds to a contractor after the formation of an implied contract to issue the necessary performance bonds. In that case, the implied agreement arose from Traveler's decision to issue a bid bond.

■ In this instance, the plaintiffs cannot premise a claim of bad faith on Seaboard's failure to issue further performance and payment bonds and its alleged concealment of that decision. Paragraph 2 of the General Agreement unambiguously provided that plaintiffs had no right to future bonding. Plaintiffs have proffered no evidence to indicate the formation of an implied contract that Seaboard would furnish bonds as necessary or on demand subsequent to the execution of the General Agreement. Absent an underlying contractual duty, plaintiffs cannot demonstrate bad faith based on Seaboard's failure to provide further bonds and any non-

disclosure of the decision to discontinue bonding of CSB.[2]

### 1. Manipulation and coercion of Attorney Garcia

Plaintiffs claim bad faith due to Seaboard's alleged manipulation and economic coercion of Attorney Garcia, who represented CSB. Seaboard argues that no evidence supports such a claim.

As Seaboard points out, Attorney Garcia stated in his deposition that Seaboard did not prevent him from taking action that he felt was necessary to represent CSB, or compel him to exclude strategies that he deemed important to defend or prosecute the case for CSB. Further, Attorney Garcia denied that he was coerced by the delay in Seaboard's payment of his attorneys fees. Accordingly, the evidence demonstrates that these allegations of bad faith cannot survive summary judgment.

### 3. Excessive legal fees

■ Plaintiffs allege that Seaboard exercised bad faith by causing excessive and unnecessary legal fees to be incurred during arbitration proceedings. This claim is based on Attorney Garcia's assertion that Seaboard had paid certain consultants for work that he believed was not necessary and asked him to investigate matters that he ordinarily would have assumed and taken a chance on. However, no evidence indicates that Seaboard's conduct was motivated by ill-will or malicious intent to expose the plaintiffs as indemnitors to liability for those expenditures.

Attorney Garcia reviewed Seaboard's requests with Mr. Walsh in terms of strategy and expense. Additionally, Attorney Garcia's deposition testimony indicates that a rational basis existed for Seaboard's expenditures. These alleged over-expenditures may be considered the result of bad judgment, which does not alone constitute bad faith. See Buckman, 205 Conn. at

171–72, 530 A.2d 596 (1987). Accordingly, summary judgment will enter.

### 4. The 1990 Agreement

■ Plaintiffs assert that Seaboard acted in bad faith by forcing plaintiff CSB to execute an unconscionable and unenforceable agreement in 1990.

In that agreement, Seaboard agreed to advance fees and expenses for the Forge arbitration in exchange for CSB's agreement to reimburse those costs from the proceeds of the arbitration award. Additionally, CSB agreed to release Seaboard of any claim or loss related to Seaboard's refusal to issue future bonds for CSB.

■ According to general contract principles, a party is bound by the provisions of a contract that he signs, unless he can show special circumstances that relieve him of such an obligation. Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 845 (2d Cir.1987). The purpose of the doctrine of unconscionability is to prevent oppression and unfair surprise. Edart Truck Rental Corp. v. B. Swirsky & Co., 23 Conn. App. 137, 142, 579 A.2d 133 (1990). Unconscionability generally requires a demonstration of an absence of meaningful choice by one party together with contract terms which are unreasonably favorable to the other party. An unconscionable contract is one "which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other." Smith v. Mitsubishi Motors Credit of America, Inc., 247 Conn. 342, 349, 721 A.2d 1187 (1998).

In this instance, the evidence reveals that Mr. Walsh reviewed the agreement and consulted with his attorney prior to its execution. Attorney Garcia explained the implication of the provision to Mr. Walsh, and he was a signatory to the agreement. No evidence indicates that Mr. Walsh exe-

---

**2.** In addition, the evidence demonstrates that Seaboard informed the plaintiffs on several occasions that it would not provide bonding until its concerns about its exposure on the Forge project were alleviated.

cuted the 1990 agreement under duress or fraud. Nor is there evidence that Mr. Walsh was deprived in any way of meaningful choice.

Furthermore, Seaboard's assertion of its right to reimbursement in the 1990 agreement cannot be considered unconscionable since the General Agreement already provided that the Walshes, as indemnitors, were obligated to indemnify and hold Seaboard harmless from all liability, losses, costs and expenses incurred by reason of Seaboard's having issued bonds on CSB's behalf.

Accordingly, Mr. Walsh should have foreseen that Seaboard would demand reimbursement for the costs related to the arbitration. The evidence demonstrates that Attorney Garcia explained the implication of the terms for the release to Mr. Walsh and that Mr. Walsh then elected to execute the agreement.

Without evidence that Seaboard acted with malice during either the negotiation or the execution of the 1990 agreement, the Court will grant summary judgment on plaintiffs' claims that Seaboard acted in bad faith by allegedly forcing the execution of the agreement and by demanding reimbursement pursuant to that agreement.

### 5. *Denial of the right to enforce and collect the arbitration agreement*

■ Plaintiffs claim bad faith based on the allegation that Seaboard has denied CSB the right to enforce and collect the Forge arbitration award. Seaboard's alleged denial of plaintiffs' rights seems to be based on Seaboard's attempt to settle the mechanics lien foreclosure litigation with the title company, which settlement agreement was premised upon Seaboard's filing a motion to substitute itself as the party in interest in that litigation.

Seaboard argues that it cannot be held liable for bad faith because it had a right to settle the litigation pursuant to the assignment of the arbitration award. *See Hutton Construction Co. v. County of Rockland,* 52 F.3d 1191 (2d Cir.1995) (upholding a surety's right to settle performance bond claims based on assignment of rights in a general agreement of indemnity). Plaintiffs have provided no opposition to this argument. Accordingly, summary judgment will enter on this final allegation of bad faith.

### B. *Intentional Infliction of Emotional Distress*

Plaintiffs' claim of intentional infliction of emotional distress is based upon the same allegations as the claims of bad faith. Defendant argues that Seaboard's conduct does not rise to the level of unreasonableness, which is necessary to sustain a cause of action for intentional infliction of emotional distress.

■ Liability for intentional infliction of emotional distress requires conduct exceeding all bounds of decent society and which is calculated to cause, and does cause, mental distress of a very serious kind. *DeLaurentis v. New Haven,* 220 Conn. 225, 266–67, 597 A.2d 807 (1991).

In the instant case, plaintiffs have failed to proffer any evidence that could reasonably permit the inference of extreme and outrageous conduct by Seaboard. Therefore, the Court will grant summary judgment on the claim for intentional infliction of emotional distress.

### C. *CUTPA*

Plaintiffs allege that Seaboard violated CUTPA due to the conduct described in the bad faith allegations. Seaboard asserts that plaintiffs' CUTPA claim fails as a matter of law.

■ To prevail on a claim of a CUTPA violation, plaintiffs must prove that Seaboard, while acting in trade or commerce, engaged in unfair or deceptive acts that caused plaintiffs to suffer an ascertainable loss. Conn.Gen.Stat. §§ 42–110b(a) & 42–110g(a). Plaintiffs may establish a CUTPA violation by showing either a deceptive or unfair practice or a practice amounting to a violation of public policy. *Vezina v.*

*Nautilus Pools, Inc.*, 27 Conn.App. 810, 819, 610 A.2d 1312 (1992).

 A practice is unfair (1) if it offends public policy as it has been established by statutes, the common law or otherwise, (2) if it is immoral, unethical, oppressive or unscrupulous, or (3) if it causes substantial injury to consumers. *Old Quarry Association v. Hickey*, 659 F.Supp. 1064, 1073 (D.Conn.1986). A practice is deceptive if it is a materially misleading representation, omission, or other practice that a consumer reasonably interpreted under the circumstances. *Southington Savings Bank v. Rodgers*, 40 Conn.App. 23, 28, 668 A.2d 733 (1995), *cert. denied*, 236 Conn. 908, 670 A.2d 1307 (1996).

As discussed above, no evidence indicates that Seaboard acted deceptively or unfairly. Additionally, plaintiffs have not demonstrated that Seaboard's conduct violates some public policy concern. Summary judgment will enter on plaintiffs' CUTPA claim.

D. *Enforceability of the General Agreement and 1990 Agreement*

In their fourth count, plaintiffs allege that Seaboard's conduct renders the General Agreement and the 1990 Agreement void and unenforceable. As discussed previously, plaintiffs have failed to proffer evidence that indicates sufficient grounds to declare these agreements void and unenforceable.

E. *Counterclaims*

 On July 12, 1996, Seaboard filed four counterclaims, asserting that it is entitled to indemnification and reimbursement for losses and expenditures incurred in connection with the Forge project and arbitration pursuant to the 1990 agreement, the General Agreement, and the plaintiffs' implied obligations. Additionally, Seaboard claims that it is entitled to recover from the plaintiffs the benefits of the Forge arbitration award pursuant to a theory of unjust enrichment.

Plaintiffs move for summary judgment on all of these counterclaims, claiming that they are barred by a three-year statute of limitations set forth in Conn.Gen.Stat. § 52–598a. Plaintiffs argue that the parties' rights and liabilities were fixed more than three years ago on June 30, 1992, the date that the Forge arbitration award was issued.

Seaboard's claims, however, are not time-barred by Section 52–598a. Although the arbitration award was issued on June 30, 1992, FSALP appealed that award. Thus, the rights and liabilities of the parties were not fixed until April 1994, when the Supreme Court rejected FSALP's final challenge. In this instance, Seaboard's counterclaims have been filed within three years of that date. Plaintiffs' motion for summary judgment will fail.

### CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment [doc. # 51] is GRANTED, and plaintiffs' motion for summary judgment [doc. # 57] is DENIED.

So Ordered.